# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IN RE CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND SCHEME
LITIGATION

This document relates to case nos.: 19-cv-01785; 19-cv-
01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-
01895; 19-cv-01904; 19-cv-01869; 19-cv-01922; 19-cv-
01870; 19-cv-01791; 19-cv-01792; 19-cv-01926; 19-cv-
01868; 19-cv-01929; 19-cv-01806; 19-cv-01906; 19-cv-
01808; 18-cv-04833; 19-cv-01898; 19-cv-01898; 19-cv-
01812; 19-cv-01896; 19-cv-01815; 19-cv-01924; 19-cv-
10713; 19-cv-01866; 19-cv-01794; 19-cv-01865; 19-cv-
01798; 19-cv-01800; 19-cv-01788; 19-cv-01928; 19-cv-
01803; 19-cv-01801; 19-cv-01894; 19-cv-01810; 19-cv-
01809; 19-cv-01871; 19-cv-01813; 19-cv-01930; 19-cv-
01818; 19-cv-01931; 19-cv-01918; 19-cv-01873

MASTER DOCKET

18-md-02865 (LAK)

# DEFENDANTS' MEMORANDUM OF LAW ON FURTHER QUESTIONING OF CHRISTIAN EKSTRAND

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

RELEVANT FACTS ...............................................................................................................2

LEGAL STANDARD..............................................................................................................7

ARGUMENT ............................................................................................................................8

    I.      The 2016 National Audit Office Press Release ......................................................8

    II.     The National Audit Office Report and Mr. Ekstrand's Emails With Ms. Munksgaard..............................................................................................................10

    III.    The Bech Bruun Report ......................................................................................14

          A.     The Bech Bruun Report Refutes Mr. Ekstrand's Defense of SKAT's Conduct..........................................................................................16

          B.     The Bech Bruun Report Supports Defendants' Statute of Limitations Theory......................................................................................17

          C.     The Bech Bruun Report Confirms SKAT's Negligence With Respect to Sven Nielsen..............................................................................19

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Accely v. Consolidated Edison Co. of New York*,
    No. 19 Civ. 5984 (DC), 2023 WL 3045795 (S.D.N.Y. Apr. 20, 2023) ............................ 14

*Highland Capital Management, L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................................................ 7

*Luce v. United States*,
    469 U.S. 38 (1984) .............................................................................................................. 7

*Palmieri v. Defaria*,
    88 F.3d 136 (2d Cir. 1996) ................................................................................................. 7

*Pappas v. Middle Earth Condominium Ass'n*,
    963 F.2d 534 (2d Cir. 1992) ............................................................................................. 14

*United States v. Miles*,
    889 F.2d 382 (2d Cir. 1989) ............................................................................................... 7

*United States v. Perez*,
    No. 09-CR-1153 (MEA), 2011 WL 1431985 (S.D.N.Y. Apr. 12, 2011) ............................ 7

*Weaver v. Bloomberg LP*,
    717 F. Supp. 3d 372 (S.D.N.Y. 2024) ............................................................................. 14

## STATUTES, RULES, AND REGULATIONS

Fed. R. Evid. 402 ...................................................................................................................... 7

Fed. R. Evid. 403 ...................................................................................................................... 7

Fed. R. Evid. 801(d)(2) ..................................................................................................... 13, 14

Fed. R. Evid. 801(d)(2), advisory committee notes ................................................................ 14

Fed. R. Evid. 801(d)(2)(C) ..................................................................................................... 14

Fed. R. Evid. 801(d)(2)(D) ..................................................................................................... 14

## OTHER AUTHORITIES

*Law Firm Probing Tax Scandal to Repay Denmark Due to Conflicts*, Bloomberg Law
    News, July 4, 2019 ........................................................................................................... 15

## INTRODUCTION

During the course of Christian Ekstrand's testimony, SKAT sought to prevent or circumscribe examination related to the following matters:

(1) a press release issued by the National Audit Office ("NAO") of Denmark in 2016 that refutes, in searing terms, the defense of SKAT's conduct that Mr. Ekstrand advanced in his testimony,

(2) the public report issued by the NAO in 2016 that provides the full reasoning behind that refutation,

(3) Mr. Ekstrand's email exchanges with Anne Munksgaard, his boss's boss, that reveals an effort to mislead and withhold information from the NAO inquiry into SKAT's conduct, in order to conceal SKAT's failure to take prompt action on the June tips; and

(4) a report by an outside law firm retained by the Danish Government in 2017 (Bech Bruun) that (a) rejects Mr. Ekstrand's defense of SKAT's conduct, (b) adopts the core of defendant's statute of limitations theory, and (c) confirms that in 2011 SKAT "should have" investigated Sven Nielsen, the one person who reviewed the reclaim applications at issue in this case, and who was later jailed for the conduct suspected by SKAT in 2011 but not properly investigated then.

The premise of SKAT's objections seems to have been that these matters were already addressed by the Court's pretrial rulings on SKAT's motion *in limine* related to comparative fault and the statute of limitations. That is largely incorrect. Only one of the four sets of documents listed above was even a subject of that motion (the 2016 NAO report). And as to that document, SKAT opened the door by eliciting extensive testimony from Mr. Ekstrand—the lone live SKAT witness that will be called in this case—that the report directly refutes. And all of

this information is also relevant for an additional reason not addressed at the *in limine* stage—the harsh public criticism of SKAT provides the obvious motive for what the defense contends is SKAT's dramatic overreach in this case, accusing people of a fraud of which they had no knowledge.

The Court largely sustained SKAT's objections, which we understand was intended to defer these issues until the Court received full briefing, while preserving Defendants' ability to recall Mr. Ekstrand by video to address these matters. For the reasons set forth below, the Court should direct Mr. Ekstrand to appear for further cross examination on each of these topics.

## RELEVANT FACTS

### *SKAT's Motion in Limine*

SKAT's motion in limine related to comparative negligence/statute of limitations sought to preclude introduction of eight documents. Dkt. 1141, at *22. The Court granted SKAT's motion in full as to five of those documents (the 2006, 2013 and 2014 internal audit reports, the 2006 Romer report, and the 2007 Jeppesen memo). Dkt. 1195, at *5. The defense does not seek to use any of these documents in cross-examining Mr. Ekstrand. As to three other documents, the 2010 internal audit report, the 2015 internal audit report, and the 2016 National Audit Office report, the Court's rulings were mixed. It permitted use of the 2010 and 2015 internal audit reports "to the extent that [each] shows that SKAT lacked the ability or otherwise failed to verify the veracity of refund claims" and permitted use of the 2015 internal audit report and 2016 NAO report to the extent either "contains data relevant to SKAT's loss amount." Dkt. 1195, at *5. But it declined to admit any of the reports to support a statute of limitations defense, finding the factual predicate insufficient. *Id. at* *1 (statute of limitations theory of relevance is "flawed

- 2 -

because it does not demonstrate that SKAT knew or should have known of its claims against these defendants") (cleaned up).

As to the 2010 and 2015 reports, Defendants reached agreement with SKAT on redactions conforming to the Court's ruling, and the Court admitted those redacted portions of the report into evidence during the cross examination of Mr. Ekstrand.

Defendants timely moved pretrial for reconsideration of the Court's ruling as to the 2016 NAO report, arguing that (like the 2010 and 2015 reports) it contained important information regarding SKAT's failure to verify the veracity of refund claims, and thus was relevant to issues of reasonable reliance, comparative fault, and the balance of the equities.  Dkt. 1211.  The Court denied reconsideration, finding that Defendants had primarily argued that the 2016 NAO report was relevant to the statute of limitations, and had not sufficiently called the Court's attention to the 2016 NAO report's relevance to reasonable reliance, comparative negligence, or the balance of equities.[1]

SKAT did not move *in limine* to exclude the remaining documents at issue in this motion: the Bech Bruun report, the NAO press release, or Mr. Ekstrand's correspondence related to responding to questions from the NAO.

### Mr. Ekstrand's Defense of SKAT's Procedures as "Consistent With An Audit"

Mr. Ekstrand spent a large portion of SKAT's direct examination outlining and defending SKAT's procedures in reviewing and approving reclaim applications.

---

[1] *But see, e.g.*, Defs. Opp. to Mot. in Limine at 5 ("Collectively, this evidence provides ample reason for a jury reasonably and fairly to question whether SKAT's reliance on thinly documented claim forms that it knew it could not verify was justifiable" and "whether SKAT's own negligence contributed to any losses it suffered"); *id. at* 20 (2016 NAO report "documents serious breakdowns in SKAT's administration of the program that go directly to the reasonableness of its reliance on any reclaim applications and its own comparative negligence, as well as the statute of limitations.").

- 3 -

First, Mr. Ekstrand gave a description of what an audit looks like in Denmark.

> And when you do the audit, you ask the individuals, or the companies, to put in documentation for their income or for the deduction. And in Denmark, the documents should be -- the most part of them should by third-party documents, **because in Denmark and in our tax system, independent third-party documents are high value**. So they need to put in third-party documents for their tax assessment.

Tr. 139:6-13 (emphasis added).

> Q: Once a company or a taxpayer is subject to an audit, what kind of documentation is required to be provided?
>
> A: **We require them to be in third-party documents, not documents that they have by themself. It has to be from a regulated third party.** It could be a bank, putting in their bank statements, insurance companies, mortgage institutes, and something like that.

Tr. 140:21-141:2 (emphasis added).

Mr. Ekstrand specifically said this type of third-party documentation is *only* required when a company is being audited. *Id*. 141:6-8.

Then, Mr. Ekstrand described the reclaim process, and in so doing, suggested the documentation received during this process was the same type of documentation as required during an audit.

> Q: Was there anything else, other than the form, required in order to submit a reclaim application?
>
> A: Yes. You also had to put in underlying documents showing that you are the beneficial owner of the shares that you want to reclaim the dividend tax. That should be a document from a third-party document from your custodian showing that you actually received the dividend, and you paid the taxes.
>
> Q: Other than the form from the third-party document from the custodian, was there anything else required?
>
> A: Yes. Because you had to be covered by the treaty, so you had to put in some documents stating that you are actually paying taxes taxable in the

- 4 -

U.S., and in this case that would be a tax certificate and that is called the 6166 in the IRS.

Tr. 150:25-151:14.

Then he specifically testified that SKAT's procedure for reviewing reclaims corresponded to an audit.

> Q: Looking at this form that the applicant has to fill out, would you describe that as a self-assessment type of form or something more akin to the tax audit that you were talking about?
>
> A: I think I will answer in Danish. (Through interpreter) If you only look at the form and it was the only thing that had been submitted, then that would correspond to the way we self-assess in Denmark. In this situation, where there's also underlying documentation from third parties, it **would, in fact, correspond to an audit.**

Tr:175:1-18 (emphasis added).

### *Mr. Ekstrand's Rejection of the Conclusion of the 2010 SIR Auditors*

On cross-examination, Mr. Ekstrand rejected the conclusions of the 2010 SIR Auditors, stating that they were neither true nor correct:

> Q: All right. Now, let's take a look at the next page, sir. The next page says that Accounting 2 does not carry out checks on whether the investor in question is actually a shareholder in the company in question or whether the investor in question is, in fact, liable for tax in the foreign country. Do you see that?
>
> A: I see that, but I also had just stated that that is not true.
>
> Q: You disagree with what the auditors found?
>
> A: I disagree, yeah.
>
> Q: Okay. But that's what the auditors found?
>
> A: I'm aware that's what they are saying, but that is not correct.

Tr. 347:8-20.

- 5 -

When asked whether he had personal knowledge of the issues at SKAT at the time of the 2010 Audit, he replied, "I have no personal knowledge, but I have investigated this for ten years. And even though this is way before 2012, so we have investigated this, I have read the report." Tr. 348:15-17.

### *Mr. Ekstrand Admitted Key Red Flags Should Have Led to Review of Defendants' Reclaim Applications*

Mr. Ekstrand admitted that in 2014, SKAT paid out more in refunds than it collected in tax for two large Danish companies—AP Moller-Maersk and TDC, an obvious sign of fraud. Tr. 382:15-24 (Maersk); 386:20-24 (TDC). And Mr. Ekstrand conceded that the Solo-associated claims were distinctively large among this population: not only was the average reclaim submitted by the pension plans associated with Solo Capital ten times larger than the average reclaim of all reclaim applications, but they were **ninety times larger** than the average reclaim submitted just a few years earlier, in 2010, before Solo began handling dividend arbitrage trading in Denmark. Tr. 387:25–388:19. During his testimony, Mr. Ekstrand further acknowledged that had SKAT's systems been functioning properly, SKAT would have learned that overpayment of dividend tax refunds had been made with respect to Maersk and TDC shares. Tr. 385:16-19. He also explained that "it ought not to be able to happen," and "should it happen, as I said before, then we need to take a look at what the grounds are for us having paid out." Tr. 384:18-24. Finally, Mr. Ekstrand agreed that such an event would be grounds for an investigation, which would involve looking at all of the reclaims submitted to SKAT related to these two issuers, including the largest ones. Tr. 384:25-385:2; 386:4-7. It is undisputed that the particular plans

- 6 -

at issue in this case traded very heavily in AP Moller-Maersk and TDC stock in 2014, seeking

reclaims of approximately DKK 322 million on just these two stocks . *See* PX-1314.

### *The Court Sustained Many SKAT Objections Related to the National Audit Office or Government Inquiries*

SKAT objected to—and the Court sustained—multiple objections to inquiry related to

the National Audit Office or other government inquiries, including: (1) questioning about the

National Audit Office's review and requests for information to SKAT, Tr. 298:12-299:3; (2)

questions about an official government board of inquiry, Tr. 306:4-10; and (3) questions about

Mr. Ekstrand's rejection of the 2010 Audit conclusions, Tr. 360:23-361:2.

## LEGAL STANDARD

Rule 402 of the Federal Rules of Evidence provides that "[r]elevant evidence is

admissible" unless prohibited by the Constitution, a federal statute, the Federal Rules of

Evidence, or other rules prescribed by the Supreme Court.  Fed. R. Evid. 402.  Evidence which is

not relevant is not admissible.  *Id.*  Under Rule 403 of the Federal Rules of Evidence, a court

may exclude otherwise relevant evidence "if its probative value is substantially outweighed by a

danger of … unfair prejudice, confusing the issues, [or] misleading the jury…."  Fed. R. Evid.

403.

"A district court's inherent authority to manage the course of its trials encompasses the

right to rule on motions in limine." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d

173, 176-77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)).

"Because a ruling on a motion in limine is 'subject to change as the case unfolds,' this ruling

constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09-

CR-1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri v.*

*Defaria*, 88 F.3d 136, 139 (2d Cir. 1996)).  As the Supreme Court has explained, an *in limine*

ruling "is subject to change when the case unfolds, particularly if the actual testimony differs

from what was contained in the [] proffer. …[E]ven if nothing unexpected happens at trial, the

district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine

ruling."  *Luce*, 469 U.S. at 41-42.  *Cf. United States v. Miles*, 889 F.2d 382, 384 (2d Cir. 1989)

(*in limine* ruling nonreviewable when defendant failed to renew objection at trial and district

court had informed counsel that pre-trial ruling was "for present purposes only").

## ARGUMENT

## I.     THE 2016 NATIONAL AUDIT OFFICE PRESS RELEASE

The NAO, known in Danish as "Rigsrevisionen," holds a unique position in the Danish

society."  It's "mandate gives [it] unrestricted access to all the information and data [it] need[s]

across the public sector." DX6005.  NAO conducted a review in 2016 of SKAT's handling of

dividend reclaims between 2012 and 2015, the period at issue in this case.  The 2016 NAO Press

Release announcing the results of that review was very publicly critical of both SKAT and the

Ministry of Taxation, and among other things, noted that "SKAT has not verified basic

information in the of [sic] dividend tax refund applications, e.g. ownership, and whether the

applicant has paid dividend tax, and that SKAT has not had a clear division of responsibilities

and tasks, management procedures and IT systems that could support the control."  DX5488,

page 2 of 5.  The NAO is an arm of the Danish government, so this is an admission of a party

opponent admissible under Rule 802.  *See* ECF 834, at para. 101 ("By its actions, the relevant

ministry or governmental body will always bind the Kingdom of Denmark.").  And the substance

is squarely within the contours of the Court's pretrial ruling admitting portions of the 2010 and

2015 audit reports.  The Defendants should be permitted to introduce the release and question

Mr. Ekstrand on this conclusion.

Further, this press release castigated SKAT for "completely inadequate control over the

payments of dividend tax refunds," and the Tax Ministry's supervision of SKAT as "extremely

inadequate."  DX5488, page 2 of 5.  It further said that the Ministry "has not taken the initiative

to investigate this area" even though the Ministry had "received a number of indications of risks

and even if simple analysis of developments would have shown that there were problems with

the reimbursement of dividend tax."  *Id*.  It therefore directly contradicts the defense of SKAT's

conduct that Mr. Ekstrand advanced in his testimony, both as to SKAT's administration of its

program—the press release criticized SKAT for having "only reacted" when it received outside

information about suspected fraud, when it had known since 2010 that its controls and

management procedures were weak—and as to SKAT's response to the Amstrup tip—it also

noted that "SKAT continued to pay refunds totaling DKK 3.2 billion following the time when

information was received from outside on suspected fraud."  *Id*.  As such, it is proper

impeachment of Mr. Ekstrand.[2]

Defendants' use of this press release is not an attempted end-run around the Court's prior

ruling.  As stated above, the use of the press release is plainly proper given how the door has

been opened by Ekstrand's testimony.  But even without that testimony, admission of the press

release would be proper.  The Court's prior ruling went to specific documents, which did not

include the press release, because SKAT did not choose to move against the press release.  And

while the ruling did *provisionally* exclude most of the 2016 National Audit Office report itself,

---

[2] The NAO report itself provides ample detail behind the conclusions of the press release, and Defendants are prepared to offer those details to the extent SKAT or the witness attempts to challenge the bases for NAO's conclusions.

which contains similar statements to those appearing in the press release, it did so *not* because it deemed those statements irrelevant on the question of reasonable reliance, comparable fault, and balance of the equities.[3]  Instead, the Court read Defendants' briefing on the motion to proffer the 2016 Report only on statute of limitations grounds.  Dkt. 1195, at *2 ("Because this evidence does not suggest that SKAT should have known of its claims *against defendants*, it would be irrelevant to defendants' anticipated statute of limitations defense.").  That logic obviously does not apply to the press release itself, since SKAT did not move to preclude it pretrial, and therefore Defendants had no opportunity or need to advise the Court of theories of relevance as to the press release.  And of course, now that Mr. Ekstrand has testified as he did, the relevance and Rule 403 analysis look very different.

## II.    THE NATIONAL AUDIT OFFICE REPORT AND MR. EKSTRAND'S EMAILS WITH MS. MUNKSGAARD

Mr. Ekstrand made a concerted effort to portray SKAT as acting carefully and diligently following the receipt of tips from Mr. Amstrup and the United Kingdom.  The 2016 National Audit Office report and Mr. Ekstrand's own emails directly rebut this testimony.

First, Mr. Ekstrand attempted to distinguish between the quality of the tips received from Mr. Amstrup and the UK as a way to explain SKAT's inaction during this seven-week period. *See, e.g.*, Tr. 196:25-198:5 (Q: Mr. Ekstrand, did you consider the information provided by the HMRC in this letter to be of a different nature than what you got from Mr. Amstrup? A: Yes. Q: Can you explain that? A: Yes, and I will do it in Danish.  Yes, because **this was a much more detailed description of the whole set up as well as the involved parties**. And then, again, it came from a foreign authority.").

---

[3] And indeed, the statements in the 2016 National Audit Office are comparable to statements on those topics the Court held relevant.

Next, Mr. Ekstrand painted his relative inaction following the receipt of the tip from Mr. Amstrup as reasonable. He described the internet searches he did, Tr. 186:3-8; 186:15-23; but also excused his lack of findings by noting that many of the names were spelled incorrectly, Tr. 181:3-7; 183:15-21 (describing misspellings in Mr. Amstrup's tips). On cross-examination, Mr. Ekstrand characterized his efforts—some Google searching, a phone call to Sven Nielsen, searching in the wrong database for information, and waiting six weeks for Sven Nielsen to respond to his e-mail—as acting "very fast" in response to the tip. Tr. 293:5-11; 294:8-10.

And Mr. Ekstrand minimized his failure to follow up with Sven Nielsen by stating that it was summer vacation, and he had not been specific in his request to Nielsen about why he wanted to speak with him. Tr. 188:19-189:5 (summer vacation); 198:17-20 (he did not inform Nielsen initially why he was reaching out).

Finally, Mr. Ekstrand minimized the effect of his lack of diligence by saying that SKAT only paid out one relevant reclaim during this period. Tr. 204:19-22 ("[D]id SKAT pay out any refunds to those companies during that six-, seven-[week] period? A: Yes, we paid out one."). He emphasized that, because of the quality of the UK tip, SKAT discussed it at a meeting and immediately stopped payment of reclaims. Tr. 203:1-25.

But SKAT—and Mr. Ekstrand in particular—did not respond appropriately to the June tips alerting them to a massive fraud perpetrated by Sanjay Shah. The 2016 NAO Report, as Mr. Ekstrand and his boss, Ms. Munksgaard discussed, established that "[SKAT] has paid out approx. DKK 3,2 billion in refunding dividend tax after the time when [SKAT] received information about the alleged fraud … . **This was despite the fact that [SKAT] was aware about the number of requests and the total amount of reimbursement had increased significantly while internal controls were deficient**. It is the National Audit Office's

- 11 -

assessment that when [SKAT] was [aware] of the lack of control in connection with the reimbursement of dividend tax, [SKAT] should have taken a number of measures as soon as possible after receiving outside information about suspected fraud." DX5483-T (emphasis added). Defendants must be permitted to confront Mr. Ekstrand with this conclusion.

Moreover, Mr. Ekstrand's interactions with the auditors who ultimately prepared this report are critical to an assessment of Mr. Ekstrand's (and SKAT's) credibility. His correspondence with Ms. Munksgaard supports an inference of an effort to mislead and hide information from NAO to avoid damage to SKAT's reputation.

Mr. Ekstrand and Ms. Munksgaard were both interviewed in connection with the NAO inquiry. Ekstrand Dep. Tr. Vol. II, 256:2–7. The national auditor gave both Mr. Ekstrand and Ms. Munksgaard the opportunity to review and comment on their review of whether SKAT should have stopped paying reclaims in June after it received the Amstrup tip, rather than waiting seven weeks to do so. Mr. Ekstrand and Ms. Munksgaard traded a series of emails about how to present their side of the story and persuade the national auditor to adopt their position. But their "story" was not true. For example, after the NAO observed that 3.2 billion Kroner were paid out after the June tip, Ms. Munksgaard suggested that the proper number to present to NAO was 1.8 billion—the amount paid in the relevant period to the reclaim agents identified in the June tip. DX5974 (admitted). Mr. Ekstrand suggested instead the same number he presented at trial (the 1.8 million Kroner paid to one of the pension plans named in the tip) and offered in support of that number the claim that one of the tips had established that the reclaim agents were "not suspected for [sic] anything." Tr. 301:3–12. But that was false, as Mr. Ekstrand was forced to acknowledge in the cross examination. Tr. 303:4–15. None of the tips said anything of the sort. And indeed, one reclaim agent, Syntax, was later found to have been in on Sanjay Shah's fraud.

But because counsel was not permitted to inquire about the purpose for which Mr. Ekstrand and Ms. Munksgaard were discussing these numbers (i.e., to respond to an inquiry from the NAO), the jury does not yet understand the full story sufficiently to be able to evaluate Mr. Ekstrand's bias and lack of credibility. [4]

Even more troubling, because the defense was not permitted to go into SKAT's interaction with the NAO at all, the jury did not hear that the NAO was told that for "reasons of confidentiality," it could not be told how SKAT and the Ministry "reacted to the outside information from the time the information was received for the payments and what possible measures were taken as a result of the outside information."  DX5483-T.  That "confidentiality" objection was preposterous:  there is nothing secret about doing some Google searches, looking in the wrong databases, and sending an email that does not get returned.  The jury could reasonably infer that confidentiality was asserted not because what was done was confidential, but because how little was done would have subjected SKAT to even more scathing criticism. Had Defendants been able to question Mr. Ekstrand on this topic, it could have undermined very materially SKAT's processes and candor, and supported the defense's argument that SKAT was willing to go to extraordinary lengths to find people to blame for its own mistakes.  Given the sum and scope of Mr. Ekstrand's testimony on this topic, and the importance of these documents to the jury's assessment of the comparative negligence and statute of limitations defense, Defendants should be permitted to question Mr. Ekstrand on these issues.

---

[4] Indeed, the Court struck Mr. Ekstrand's acknowledgment that this discussion related to responding to the NAO inquiry into what had happened.  Tr. 298-99.

## III.    THE BECH BRUUN REPORT

The Bech Bruun report (DX5626-T), an official report commissioned by the Danish government's Commission of Inquiry on Tax to get to the bottom of how SKAT was purportedly defrauded, found that SKAT's refunding of "dividend tax on request without having carried out a check on whether the substantive conditions for doing so were met did not comply with the requirements for administrative law for sound investigation as a condition for taking a decision." *Id.* at page 6 of 7. This is precisely the type of conclusion that the Court specifically permitted the Defendants to introduce, because it demonstrates that "SKAT lacked the ability or otherwise failed to verify the veracity of a refund claim." Dkt. 1195, at *4.

Defendants expect that SKAT will object to the Bech Bruun report as inadmissible hearsay. It is not. The Bech Bruun report, like the NAO materials, is a statement of a party-opponent under Rule 801(d)(2). Rule 801(d)(2) defines as not hearsay the statement of an opposing party. SKAT has previously taken the position in sworn declarations of Danish legal experts that SKAT <u>is</u> a part of the Danish government and can therefore assert claims on its behalf even though SKAT admittedly pays away every dollar it collects. Dkt. 834, Declaration of Mas Bryde Andersen, at ¶¶ 97–99. If SKAT is Denmark for purposes of standing and damages, so too must SKAT be the Danish government for hearsay purposes.

Bech Bruun was hired by the Danish government to conduct an investigation and issue a report on its behalf. This report is therefore admissible under several of the bases listed in 801(d)(2)—the report was made by a law firm (Bech Bruun) the Danish government authorized to make a statement on the subject (801(d)(2)(C)); and was made by the plaintiff's agent or employee (Bech Bruun) on a matter within the scope of that relationship and while it existed (801(d)(2)(D)). *See Accely v. Con Ed of New York*, No. 19 Civ. 5984 (DC), 2023 WL 3045796,

at *4 (S.D.N.Y. Apr. 20, 2023) ("The entirety of the ODI Report is admissible against Con Ed under the hearsay exclusion for party-opponent statements. When he conducted his interviews, wrote his report, and submitted it for review and approval by the ODI, Ohene was Con Ed's agent or employee, and the assertions in the report all fall within the scope of Ohene's agency or employment relationship with the company.").

SKAT has also indicated that it intends to object to this report on the grounds that Bech Bruun had an undisclosed conflict at the time it was hired to conduct the report, which SKAT contends renders the report and its conclusions unreliable.  This argument is wrong.  First, a party has no right to complain about the reliability of its own statements when offered against it under Rule 802.  *See  Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992) (explaining that "admissions against a party's interest are received into evidence without many of the technical pre-requisites of other evidentiary rules—such as, for example, trustworthiness and personal knowledge" and "should be granted freely"); *Weaver v. Bloomberg LP*, *Weaver v. Bloomberg LP*, 717 F.Supp.3d 372, 389 n.7 (S.D.N.Y. Feb. 20, 2024)  ("personal knowledge" not required for admission under Rule 802(d)(2)); Fed. R. Evid. 801(d)(2), advisory committee notes ("Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. … No guarantee of trustworthiness is required in the case of an admission.").  Moreover, SKAT's attack on the report's reliability is specious. Bech Bruun is one of the largest law firms in Denmark.  The investigation was thorough, involved review of voluminous documents, and resulted in a 600-page report.  SKAT has not identified a single factual inaccuracy in the report, and the conclusion of the report itself has to

our knowledge never been withdrawn or otherwise repudiated by the Danish government.[5]
SKAT is of course free to attempt to impeach the report the Danish government commissioned
and accepted in any way it deems appropriate. But it is not entitled to categorical preclusion.

Further, the evidentiary record now demonstrates that this report's conclusions are even
more critical for the jury to see. The report (A) contradicts Mr. Ekstrand's defense of SKAT's
conduct; (B) provides critical evidence that goes to Defendants' statute of limitations theory; and
(C) confirms that in 2011 SKAT should have undertaken an investigation of Sven Nielsen.

### A.    The Bech Bruun Report Refutes Mr. Ekstrand's Defense of SKAT's Conduct

Throughout his testimony, Mr. Ekstrand attempted to leave the jury with the impression
that SKAT's system for approving reclaim applications was the equivalent of an audit under
Danish processes. Mr. Ekstrand's testimony was clearly designed to suggest that SKAT was
careful and diligent when it came to reviewing reclaim requests and met all expectations in
Denmark. But the Bech Bruun report shows that was not true, concluding that SKAT having
paid out refunds of dividend tax "without having carried out a check on whether the substantive
conditions for doing so were met did not comply with the requirements of administrative law for
sound investigation as a condition for taking a decision." DX5626-T at page 6 of 7 (1.1.1). It
further concluded that SKAT's organization in the area of dividend tax "must be characterized as
inadequate," in part because of "high resource pressure, partly because of the general resource
situation at SKAT and partly for specific staff reasons." *Id.* (1.1.5). To cure the misimpression
this direct exam created, Defendants need to be allowed to confront Mr. Ekstrand with the

---

[5] Bech-Bruun was required to reimburse the Danish government the fee it received to investigate the tax scandal based on it conflict of interest. *Law Firm Probing Tax Scandal to Repay Denmark Due to Conflicts*, Bloomberg Law News, Jul. 4, 2019.

findings of this public report that SKAT did **not** act diligently in administering its reclaim system.

To be sure, there is overlap between this conclusion and that offered by the 2016 National Audit Office report. But that does not make the report cumulative. Ekstrand boldly asserted that despite lack of personal knowledge, he was the expert on what SKAT did and did not do between 2010 and 2015, based on his ten years of work on the investigation. The jury may assume that Mr. Ekstrand learned something in the past decade that was not known at the time of the 2010 audit, and so should hear that not one but *two* different official reviews conducted years later reject his position. Moreover, both rejections of Ekstrand's position were *public*. The jury is entitled to hear that SKAT was subjected to a steady drumbeat of criticism that did not abate over time, which helps explain why it has been so motivated to overreach in this case.

### B.    The Bech Bruun Report Supports Defendants' Statute of Limitations Theory

Mr. Ekstrand put in a great deal of effort to convince the jury that SKAT had no basis to investigate its reclaim procedures before the receipt of the tip from the United Kingdom in late July 2015. Even aside from SKAT's inaction in the face of the earlier Amstrup tip, the Bech Bruun report is also relevant because it concluded that SKAT "reacted too late to the significant and constant increases in dividend tax refunds observed from **around spring 2013 and the response – when it came – was inadequate**." DX5626-T at page 6 of 7 (emphasis added). The report goes on to say that "SKAT should have launched a proper investigation into the cause of the increases, at least at the time in early summer 2014 when the increase was involved in the context of the accounting approvals, **but based on the development of refunds probably somewhat earlier**." *Id.* (emphasis added).

That conclusion combines with and supports the trial evidence relevant to the statute of limitations elicited in Mr. Ekstrand's cross, all of which provides ample predicate for the statute of limitations argument the Court found lacking at the time of the *in limine* motion.  In 2014, SKAT paid out more in refunds than it paid out in tax for two large Danish companies—AP Moller-Maersk and TDC.  Tr. 382:15-24 (Maersk); 386:20-24 (TDC).  During his testimony, Mr. Ekstrand acknowledged that had SKAT's systems been properly designed, and not disabled, SKAT would have learned that more dividend tax was refunded than collected with respect to Maersk and TDC shares in 2014, an obvious red flag of fraud.  Tr. 385:16-19.  He also explained that "it ought not to be able to happen," and "should it happen, as I said before, then we need to take a look at what the grounds are for us having paid out."  Tr. 384:18-24.  In other words, Mr. Ekstrand agreed that such an event, had SKAT's disabled and poorly designed systems not failed to flag it, mandated an investigation.  Tr. 384:25-385:2.    And he agreed that such an investigation would have required reviewing all the reclaims submitted with respect to those two stocks in 2014, which (as the data listed above confirms) would have pointed a finger dramatically and directly at Solo Capital and the Defendants' plans, which at the time of the 2014 Maersk and TDC trades used Solo as a custodian.[6]  The conclusion of the Bech Bruun report supplies the logical conclusion from what Ekstrand had to admit, and, importantly, places in time when the investigation should have begun—summer 2014, if not earlier.  And had an

---

[6] An analysis later conducted by Christian Ekstrand and John Christiansen at SKAT's Special Checks branch concluded that companies associated with Sanjay Shah were responsible for **73.95%** of the dividend tax recovered for AP Moller-Maersk dividends, and **158%** of the amount attributable to foreign shareholders, the only ones eligible to file reclaims using the process at issue in this case.  DX5466-T at page 8 of 9.  A similar analysis for TDC found that companies associated with Sanjay Shah were responsible for 60% of the dividend tax refunded for these shares, and 54% of the amount attributable to foreign shareholders.

investigation begun, the reclaim applications at issue in this case would have stood out as far larger than the average.

### C.    The Bech Bruun Report Confirms SKAT's Negligence With Respect to Sven Nielsen

As Mr. Ekstrand testified, Sven Nielsen was the person who was processing and handling all of the reclaim applications.  Tr. 326:1-5 (reading Mr. Ekstrand's prior testimony in the UK proceeding).  Given SKAT's decision to cut its internal staffing to the bone, it is highly relevant to any analysis of its comparative fault that it chose to leave Mr. Nielsen as the person handling reclaim applications given its knowledge—in 2011—of concerns surrounding his potential criminal conduct.  The Bech Bruun report noted that the "specific circumstances of the tax assessment case that SKAT dealt with in 2011 should have led to an investigation by SKAT not only of the employee [Sven Nielsen], but also of the person from whom the transfers of the amount originated."  DX 5626-T at 6.  And "[i]t would have been appropriate if the relatively large sums transferred to Sven Nielsen had given rise to reflections on the risks" that SKAT personnel were "aware of in 2011 in the area of dividend tax.  Bech Bruun Report Excerpt, at SKAT_MDL_001_0075162_T.[7]  The Bech Bruun report is also corroborated by the notes of Lars Nørding, which state that as of 2011, SKAT was considering whether to suspend Mr. Nielsen from his position, given unexplained income in his bank account suspected to have been the result of Mr. Nielsen taking bribes to approve reclaim applications.  DX-5986.  The jury should be permitted to hear this evidence and consider whether leaving a man suspected of taking bribes to approve reclaim applications in a job where he is the person responsible for

---

[7] Defendants are having this portion of the Bech Bruun report translated for purposes of questioning Mr. Ekstrand. What is quoted in this sentence is from a machine translation.

- 19 -

approving those applications was negligent on SKAT's part, and whether that negligence is relevant to the defense of comparative fault.

## CONCLUSION

Defendants respectfully request that they be permitted to recall Mr. Ekstrand via videoconference and question him in front of the jury about these issues.

Dated: New York, New York
January 11, 2025

Respectfully submitted,

/s/ *Peter G. Neiman*

Boyd M. Johnson
Peter G. Neiman
Alan E. Schoenfeld
Nelson S. Castaño
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Boyd.Johnson@wilmerhale.com
Peter.Neiman@wilmerhale.com
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

Brittany R. Warren
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennylvania Ave NW
Washington, DC 20037
(202) 663-6772
Brittany.Warren@wilmerhale.com

*Attorneys for Richard Markowitz, Jocelyn
Markowitz, Avanix Management LLC Roth
401(K) Plan, Batavia Capital Pension Plan,
Calypso Investments Pension Plan, Cavus
Systems LLC Roth 401(K) Plan, Hadron
Industries LLC Roth 401(K) Plan, RJM Capital
Pension Plan, RJM Capital Pension Plan
Trust, Routt Capital Pension Plan, Routt
Capital Trust*

- 21 -

/s/ *Sharon L. McCarthy*
Sharon L. McCarthy
KOSTELANETZ LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com

Nicholas S. Bahnsen
Daniel C. Davidson
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, DC 20001
(202) 875-8000
nbahnsen@kostelanetz.com
ddavidson@kostelanetz.com

*Attorneys for Defendants John van Merkensteijn, III, Elizabeth van Merkensteijn, Azalea Pensión Plan, Basalt Ventures LLC Roth 401(K) Plan, Bernina Pension Plan, Bernina Pension Plan Trust, Michelle Investments Pension Plan, Omineca Pension Plan, Omineca Trust, Remece Investments LLC Pension Plan, Starfish Capital Management LLC Roth 401(K) Plan, Tarvos Pension Plan, Voojo Productions LLC Roth 401(K) Plan, Xiphias LLC Pension Plan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2025, the foregoing document was served electronically to all parties of record by the CM/ECF system.

*/s/ Peter G. Neiman*

Peter G. Neiman

January 11, 2025

- 23 -